IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 6, 2022

## NEWT CARTER v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-11-282     Roy B. Morgan, Jr., Judge**

_____

### No. W2022-00474-CCA-R3-PC
_____

In 2008, a Madison County jury convicted the Petitioner, Newt Carter, of aggravated rape and aggravated burglary. The trial court imposed an effective sentence of twenty-five years. Multiple filings ensued, the last of which was a motion to reopen post-conviction proceedings. The trial court held a hearing and denied relief. On appeal, the Petitioner contends that his motion to reopen should have been granted based on newly discovered evidence that he received the ineffective assistance of counsel. After review, we dismiss the appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Appeal Dismissed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and KYLE A. HIXSON, JJ., joined.

William J. Milam, Jackson, Tennessee, for the appellant, Newt Carter.

Jonathan Skrmetti, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Michelle R. Shirley, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts and Background**

This case arises from the Petitioner's rape and burglary of the victim, his girlfriend's mother, while wielding a weapon. In an opinion addressing his petition for post-conviction relief, this court summarized the facts as follows:

At 5:00 a.m., the victim awoke to a man tapping her temple with a gun. The man wore a stocking cap over his face and was otherwise naked. He whispered to her to "drop 'em." When she hesitated to remove her clothes, he told her to "[h]urry up." She did not recognize his voice, and she could not tell what race the man was. She removed her clothes, and the man instructed her to lie down on the bed. He fondled her breast and moved his hand between her legs. Then, he told her to "suck it." She performed oral sex on him until he told her to get on her knees on the bed. The victim testified that he penetrated her vagina with his penis. She was unable to tell whether he wore a condom. After approximately five minutes, he stopped and laid down, ordering her to get on top of him. He penetrated her again. The victim said that after he was finished, he ordered her to clean up. Throughout the rape, he pointed the gun at her head. She went into her bathroom and washed her vaginal area. The victim testified that she was able to see at that point that the man was dark-skinned and five feet, ten inches, tall. He told her to "[g]et on up in there[,]" and she complied by washing the interior of her vaginal area with a washcloth. While she washed, the man ran downstairs and out the back door. She waited before she went downstairs and locked the door.

After she locked the door, she returned upstairs and began calling her daughter. She heard a noise at her window and shut off her phone before completing the call. The victim said that she took a bat out of her bedroom closet and stood in her room until she gathered the courage to call her daughter. When she called, her daughter answered the phone, but the [Petitioner] "grabbed the phone." She told him what happened to her. He arrived at her apartment, letting himself in with a key. The victim said that she was unsure what time the police arrived because she was hysterical. The police took her to the emergency room, where hospital personnel examined her utilizing a rape kit, which involved taking her blood and examining her genital area. The victim testified that she had known the [Petitioner] for six years. She had never had a sexual relationship with him.

. . . .

On redirect examination, the victim testified that she began to suspect the [Petitioner] "because he was acting funny, and he said, 'They can't get me. . . . They can't get me for that.'"

. . . .

2

Jackson Police Investigator Danielle Jones testified that she first met the victim at the hospital on July 1, 2006. Later on the same day, she spoke with the [Petitioner]. She considered him to be a possible witness because he was the last person to have contact with the victim, he was the first person on the scene after the rape, and the responding officers considered his behavior to be suspicious. Investigator Jones obtained a DNA sample from the [Petitioner] by swabbing the inside of his cheeks. She sent the victim's sexual assault kit and the [Petitioner's] oral swabs to the Tennessee Bureau of Investigation ("TBI") laboratory in Nashville for comparison. She said the victim gave her a "supplemental description" that her assailant was dark-skinned and five feet, ten inches tall.

. . . .

Sara Shields, a DNA analyst at Bode Technology, testified that she analyzed the evidence received from the TBI regarding this case. She used the victim's blood sample and the [Petitioner's] oral swabs to create DNA profiles for comparison to the evidence. Ms. Shields testified that the victim's vaginal swab, her panties, the towel, and the bedsheets contained two DNA profiles, that of the victim and that of the [Petitioner]. She testified that the possibility that any person was the source of the male DNA profile, other than the [Petitioner], exceeded the current world population.

. . . .

The [Petitioner] testified that he did not rape the victim nor did he enter her home without permission. He said that between 10:00 a.m. and 11:00 a.m., on June 30, 2006, he had consensual sex with the victim at her apartment. He did not use a condom, and afterwards, he washed with a towel in her bathroom. The [Petitioner] testified that he and the victim had been in an ongoing sexual relationship since he graduated from high school. . . . The [Petitioner] said that he cooperated with the police in their investigation by giving his consent for them to take his DNA and answering all of their questions.

*Newt Carter v. State*, No. W2013-00506-CCA-R3-PC, 2014 WL 1669957, at *1-2 (Tenn. Crim. App., at Jackson, Apr. 25, 2014), *perm. app. denied* (Tenn. Aug. 27, 2014). For these crimes, the trial court sentenced the Petitioner as a Range I, standard offender to twenty years to be served at 100 percent for the aggravated rape to be served consecutively to five years at thirty percent for the aggravated burglary. *Id.* at *1.

3

The Petitioner filed a direct appeal, claiming that the evidence was insufficient to sustain his convictions. *State v. Newt Carter*, No. W2009-00600-CCA-R3-CD, 2010 WL 2349207, at *1 (Tenn. Crim. App., at Jackson, June 11, 2010). This court affirmed the judgments, and our supreme court denied permission to appeal. *Id.* Thereafter, the Petitioner filed a petition for post-conviction relief, which the post-conviction court ultimately denied after two hearings. *Newt Carter*, No. W2013-00506-CCA-R3-PC, 2014 WL 1669957, at *6. On appeal, this court affirmed the denial of relief, and the Tennessee Supreme Court further denied review of his claims. *Id.* at *9.

The Petitioner proceeded to file, *pro se*, a motion to reopen his post-conviction petition, claiming that *Nunley v. State*, 552 S.W.3d 800 (Tenn. 2018), created a retroactive constitutional right to introduce newly discovered evidence of the transcript of closing arguments at his trial. The State responded with a motion to dismiss, alleging that *Nunley* did not establish a new constitutional right, and that the Petitioner's claims in the motion were waived for not having been raised on direct appeal.

The post-conviction court held a hearing on the motion to reopen, during which the parties presented the following evidence: the Petitioner testified that he was convicted in 2008. Following his jury trial, the Petitioner filed an appeal through a legal aid. The Petitioner stated that he did not have access to the transcript from his trial at the time and that he received an incomplete copy of the transcript in 2009 or 2010, but it did not include closing arguments. The Petitioner testified that he made every effort to obtain the missing portion by contacting the clerk and the judge and received it in 2021. He testified that he had "problems" with the language used during the closing arguments, specifically the reference to him as a "liar," but he stated that his attorney did not object at the time.

The Petitioner stated that he did not raise the issue of prosecutorial misconduct during closing arguments in his direct appeal because he did not have the transcript at the time of the appeal.

At the conclusion of the hearing, the post-conviction court stated:

> I have reviewed for purposes of today's motion to reopen the old post-conviction case of C-11-282, the entire record. I have looked into the underlying criminal matter, and I've looked into the post-conviction file and considered the petition, the motion itself filed by [the Petitioner], and also the response filed the State. I've heard the sworn testimony today of [the Petitioner], and I've considered the arguments of Counsel, particularly the state's motion to dismiss for the reason stated. . . . . So, it appears, [that the Petitioner], as the State alluded to, is proceeding on the first part -- some appellate court establishing a constitutional right, because this transcript deals with the issue of the closing argument. Now, Mr. Joseph Howell did

4

take over for appeal in the criminal case on behalf of [the Petitioner]. . . . Mr. Howell got the transcripts of the trial. I signed an order for Mr. Howell to get those transcripts, so he did get the transcripts.

. . . .

Now, when I looked at the specifics of the Statute 40-30-117, and I looked to the first part that [the Petitioner] is relying upon. He's claiming that the *Nunley* case . . . established some new constitutional right of some sort. . . . . I agree that the *Nunley* case does not establish a new right. It really deals with, as the State pointed out, *Brady* material and *Brady* claims, not new constitutional rights. . . . . I also, in conjunction with that in making my ruling, agree with the state as they pointed out in questioning the [P]etitioner. Mr. Carter was present the whole time and has had opportunities from years back to talk to Mr. Howell in the criminal appeal, talk to Mr. Howell in the post-conviction case, and discuss any issues on any allegations regarding closing argument. It's not a new thing. It's not a newly discovered thing, and he had the benefit of counsel to do that.

So, again, considering the *Nunley* ruling that the statute itself, TCA 40-30-117, and the fact that [the Petitioner is] proceeding only under that first part, establishing a constitutional right that did not exist in the *Nunley* case, and how it does not apply to this case, and all the time that's transpired that the [P]etitioner had to obtain the transcript, if he felt like he needed it, the Court must deny the motion to reopen. It is not newly discovered. It is not a constitutional right created that did not exist at the time of his trial.

It is from this judgment that the Petitioner appeals.

## II. Analysis

On appeal, the Petitioner argues that the post-conviction court erred when it denied his motion to reopen post-conviction proceedings based on the newly discovered evidence of the transcript of the closing arguments at his trial. The State responds that this court lacks jurisdiction to consider the Petitioner's motion to reopen post-conviction proceedings because the Petitioner failed to comply with the procedures for seeking review of a motion to reopen a petition for post-conviction relief. The State also responds that the Petitioner's claim is not based on a retroactive constitutional right that has been newly established. We agree with the State.

The grounds for reopening a petition for post-conviction relief are narrow:

5

(a) A petitioner may file a motion in the trial court to reopen the first post-conviction petition only if, as relevant here, the following applies:

> (1) The claim in the motion is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required. The motion must be filed within one (1) year of the ruling of the highest state appellate court or the United States supreme court establishing a constitutional right that was not recognized as existing at the time of trial;

(b) The motion must set out the factual basis underlying its claims and must be supported by affidavit. The factual information set out in the affidavit shall be limited to information which, if offered at an evidentiary hearing, would be admissible through the testimony of the affiant under the rules of evidence. The motion shall be denied unless the factual allegations, if true, meet the requirements of subsection (a). If the court grants the motion, the procedure, relief and appellate provisions of this part shall apply.

T.C.A. § 40-30-117(a)-(b) (2018).

A post-conviction court's denial of a motion to reopen a post-conviction petition does not afford a petitioner an appeal as of right, *see* Tennessee Rule of Appellate Procedure 3(b), rather, such denial may be challenged on appeal only by the filing of an application for permission to appeal no later than thirty days after the denial by the post-conviction court. T.C.A. § 40-30-117(c); Tenn. Sup. Ct. R. 28, § 10(B). There are four requirements for an appeal from a motion to reopen to be considered: (1) the timeliness of filing, (2) the place of filing, (3) the application to be filed, and (4) the attachments to the application. *Graham v. State*, 90 S.W.3d 687, 689 (Tenn. 2002). "In general, the contents of an application for permission to appeal must include the date and judgment from which the petitioner seeks review, the issue which the petitioner seeks to raise, and the reasons why the appellate court should grant review." *Id.* at 691. Whether a notice of appeal satisfies the requirements of an application for permission to appeal is a matter of substance over form. *Id.* The four statutory requirements are mandatory. *Timothy Roberson v. State*, No. W2007-00230-CCA-R3-PC, 2007 WL 3286681, at *9-10 (Tenn. Crim. App., at Jackson, Nov. 7, 2007), *perm. app. denied* (Tenn. Apr. 14, 2008).

In the present case, the Petitioner has failed to comply with the statutory requirements for seeking appellate review. Specifically, the Petitioner failed to file an application for permission to appeal the denial of his motion, as required by Tennessee Code Annotated section-30-117(c) and Tennessee Supreme Court Rule 28, § 10(B). As

6

the notice of appeal filed by the Petitioner does not substantially comply with the procedural requirements set out in the statute and corresponding rule, it is insufficient to vest this court with jurisdiction.

## III. Conclusion

Because the Petitioner failed to comply with the statutory requirements for seeking discretionary review of the denial of his motion to reopen the post-conviction petition, we lack jurisdiction in this case. Accordingly, the appeal is dismissed.

_____
ROBERT W. WEDEMEYER, JUDGE